Filed 4/27/16

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

|  |  |
|---|---|
| FRIENDS OF MARTIN'S BEACH, Plaintiff and Appellant, v. MARTIN'S BEACH 1 LLC et al., Defendants and Respondents. | A142035 (San Mateo County Super. Ct. No. CIV517634) |

At issue in this case is a dispute between the public and property owners over the use of a road, parking area and the inland dry sand of a popular beach. There is no disagreement about defendants' ownership of these areas or the property of which they are a part. Rather, the public rights claimed by plaintiff are predicated on two theories. The first is that a provision of the California Constitution confers on the public a right of access over private property to the tidelands. The second is that under the common law of dedication the defendants' predecessors—who owned the property from early in the 20th century until defendants purchased it in 2008—through their words and acts offered to dedicate the road, parking area and inland sand to public use over a period of decades, and the public accepted that offer by using those parts of the property. In this appeal, plaintiff challenges the trial court's grant of summary adjudication to defendants on plaintiff's claims asserting these theories and on defendants' counterclaims seeking to refute them.

The case presents a number of intriguing issues, among them the meaning of Article X, section 4 of the California Constitution and its application, if any, to lands for which title is derived from a provisional Mexican land grant confirmed by a federal patent issued in the 19th century. These issues require consideration of a federal statute

1

known as the Act of 1851 and the Treaty of Guadalupe Hidalgo, which that Act implemented. The case also concerns the common law theory of dedication of land to public use and what facts suffice to establish the elements of such a claim. Creating yet additional interest, the State of California and its agencies contend in an amicus brief that they were indispensable parties to this action because it involves California tidelands and that the judgment rendered without them is void.

For the reasons that follow, we affirm for the most part the trial court's grant of defendants' summary adjudication motion rejecting plaintiff's constitutional theory, which presents only issues of law. However, we reverse its grant of summary adjudication on the claims alleging dedication, because the record is insufficient to establish there was no dedication as a matter of law. We also reverse its grant of summary judgment to the LLCs on their cross-complaint and reverse its grant of summary adjudication to the LLCs on Friends' constitutional claims to the extent that part of the order purports to quiet title to tidelands and submerged lands, and order the trial court on remand to modify that part of its order to delete any reference to quieting title to tidelands and submerged lands. Finally, we reject the State Amici's claim that they are indispensable parties and that the trial court decision is therefore void.

## BACKGROUND[1]

This appeal concerns land that fronts on California's Pacific coast, a few miles south of the City of Half Moon Bay in San Mateo County. The land consists of two parcels bounded on the east by Highway 1 and on the west by the Pacific Ocean (the Property). At the western edge of the Property is a crescent-shaped strip of land known as Martin's Beach. Martin's Beach is bounded to the north and south by high cliffs that extend into the water. Other than by water, the only means of access to Martin's Beach is

---

[1] The facts set forth here are taken from the summary judgment record, including allegations in the complaint that the defendants did not dispute for purposes of their summary judgment motion.

2

via Martin's Beach Road (the road), which runs across the Property from Highway 1 to the beach.

The Property was once part of a larger tract of land known as the Rancho Cañada de Verde y Arroyo de la Purísima (the Rancho). In 1838, when what is now California was still part of Mexico, the Rancho was the subject of a petition by José María Alviso (José María), a Mexican citizen, to the then-Governor of California for a grant of the land and permission to occupy it. (*United States v. Alviso* (1859) 64 U.S. 318, 319 (*Alviso*).) The Governor provisionally granted the Rancho to José María, and in 1839 the prefect of the district agreed to reserve the land for José María and permitted him to occupy it. (*Id.*) In 1840, José María conveyed his interest in the Rancho to his brother, José Antonio Alviso (Alviso). (*Id.*) Alviso proceeded to improve and cultivate the land and to reside on it with his family. (*Id.*) The grant apparently was not finalized by the time war broke out between Mexico and the United States in 1848. (See *id.*)

To end the war later that year, the United States and Mexico entered into the Treaty of Guadalupe Hidalgo, which provided that in the territories Mexico ceded to the United States, including what is now California, "property of every kind, now belonging to Mexicans not established there, shall be inviolably respected." (Treaty of Peace, Friendship, Limits, and Settlement between the United States of America and the Mexican Republic, art. VIII, Feb. 2, 1848, 9 Stat. 922 (Treaty of Guadalupe Hidalgo or the Treaty).) In 1851, Congress passed legislation to implement the Treaty and settle claims to land based on Spanish and Mexican grants. The Act of 1851 required parties making such claims to submit evidence to a Board of Land Commissioners (the Board) within two years. (See Act of March 3, 1851, ch. 41, 9 Stat. 631, 31st Sess., ch. XLI, §§ 1, 8 (1851 Act); *Summa Corp. ex rel. Lands Comm'n v. California* (1984) 466 U.S. 198, 206 (*Summa*).) The Board in the first instance, and if its decision was appealed, the federal courts, would resolve disputes between the United States and any claimant. (1851 Act, § 15.) Claims that were confirmed resulted in a federal patent (*id*. § 13), which is the equivalent of a deed from the federal government conveying fee simple ownership. (73B C.J.S., Public Lands, § 235, p. 198 (2015).)

3

Pursuant to the 1851 Act, Alviso timely filed a patent claim for the Rancho, which was confirmed by the Board. On appeal by the United States, the district court and ultimately the United States Supreme Court confirmed Alviso's claim. (See *Alviso*, *supra*, 64 U.S. 318.) Thereafter, the Rancho was surveyed, and the government issued a patent to Alviso.

Over time, the Rancho was divided into smaller parcels and conveyed to various persons. Among them were members of the Deeney family, who acquired the Property in a series of transactions, the first of which was in 1899. In about 2008, R.M. Deeney sold the Property to Martin's Beach 1, LLC and Martin's Beach 2, LCC (LLCs).

According to plaintiff, before the LLCs purchased the Property, the road and the beach for decades had been open to and used by the public, who picnicked, barbequed, fished, surfed and otherwise enjoyed the beach. From the 1930s or earlier, the Deeney family or their lessees had encouraged the public to use the road and Martin's Beach. They erected a billboard on the nearby highway inviting the public to use the beach and provided a general store, public toilets and a parking area at or near the beach. For some of that time—though for how long and for what purpose are not evident—they charged a fee.

Initially, the LLCs continued to allow the public to use the road, the parking area and the beach, charging a fee. In the fall of 2009, the LLCs locked a gate barring the entrance to the road, placed "No Trespassing" signs there and hired security in an effort to prevent the public from using the road or the beach. There was a hue and cry from surfers and other persons who had used the beach over the years, and they staged rallies, generated press coverage and used social media in an effort to persuade the LLCs to reverse course. The LLCs declined the invitation, and this suit followed.

Plaintiff, Friends of Martin's Beach (Friends), an unincorporated association, filed a complaint[2] against the LLCs "on behalf of the general public," asserting

---

[2] The operative complaint that is the subject of this appeal is the first amended complaint, which we will refer to simply as "the complaint."

"nonexclusive rights and interests acquired by the general public in the beach to high tide at Martin's Beach, the dry sand inland, an inland area historically used for parking and access along Martin's Beach Road." Friends sought injunctive and declaratory relief and a judgment quieting title based on four theories: (1) the public trust doctrine guarantees the general public the right to use the tidelands and gain access to them via Martin's Beach Road (public trust theory), (2) California Constitution Article X, section 4 (Article X, section 4) prohibits owners of lands fronting navigable waters from excluding the right of way to such waters and entitles the public to an easement over the road and inland dry sand to access the tidelands (constitutional theory), (3) the LLCs' predecessors offered, by words and actions, to dedicate to the public access to the tidelands via Martin's Beach Road, use of the inland dry sand and parking area, which the public accepted by using the road, beach and parking area for many decades (common law dedication theory), and (4) custom "so ancient that it antedates any memory of private ownership" entitles the public to use the dry sand above the high tide (ancient custom theory).[3]

In response, the LLCs filed a verified cross-complaint[4] seeking to quiet title and for declaratory and injunctive relief against Friends and all persons unknown claiming any interest in the LLCs' property.[5] The LLCs alleged that each of them owns one of the two parcels comprising the Property, they acquired title to the Property through grant deeds recorded in July 2008, the Property is privately owned and the public has no

_____

[3] The complaint asserted seven causes of action, as follows: first (injunctive relief based on all theories), second (public easement over road based on constitutional theory), third (public easement over road, inland dry sand and parking areas based on express dedication theory), fourth (quiet title to tidelands and inland dry sand based on the public trust theory), fifth (quiet title to the dry sand above high tide based on ancient custom theory), sixth (declaratory relief based on all theories) and seventh (public easement to inland dry sand and parking area based on constitutional theory).

[4] The operative cross-complaint is the first amended cross-complaint, which we will refer to as simply "the cross-complaint."

[5] It served the public by publication. It did not serve the State or any of its officials or agencies.

easements allowing public use, there has been no express or implied dedication of any part of the Property and none of it is subject to any development permit with conditions that include beach access or use. Last, they alleged that Friends and others had trespassed on the Property to use the private road across it and portions of the Property above the mean high tide line without permission and despite the LLCs' placement of no trespassing signs on the Property, hiring security, contacting the sheriff's department and taking other steps to prevent such trespass.

The LLCs filed a verified answer to the complaint, and Friends filed a verified answer to the cross-complaint.

Friends filed a motion for summary adjudication on its second cause of action, which sought to quiet title to a public easement over Martin's Beach Road based on its constitutional theory.

The LLCs filed a cross-motion for summary judgment or adjudication[6] on each of the seven causes of action in Friends' complaint. The LLCs also moved for summary adjudication of the first and second causes of action in their cross-complaint for quiet title and declaratory relief. The LLCs argued that (1) Friends' claims that the Property was held in public trust were barred by the State's failure to assert a public trust interest during the patent proceedings in the 1800s that confirmed the rights of LLCs' predecessor, Alviso, in lands derived from the Mexican government; (2) the California Constitution did not give the public an easement over private property; (3) the Deeneys did not make an express dedication of public rights, and (4) Friends' ancient custom theory failed as a matter of law. The LLCs also sought summary adjudication on the first and second causes of action in their own cross-complaint on the ground that Friends and others had no right to use or access the Property above the mean high tide line under any theory.

---

[6] For convenience, we will hereafter refer to the LLCs' motion as a motion for summary adjudication rather than a motion for summary judgment and adjudication.

6

The superior court heard arguments on the motions and announced its opinion orally. It denied summary adjudication to Friends on its second cause of action and granted the LLCs' motion for summary adjudication on Friends' first through seventh causes of action and on the first and second causes of action of the LLCs' cross-complaint.[7] It rejected each of Friends' four theories.

Along with a written memorandum of decision and order, which it issued on April 30, 2014, the court issued judgment on the complaint and cross-complaint. Friends timely appealed.

In its opening brief, Friends withdrew a part of its appeal, narrowing the claims and issues before this court. Remaining are Friends' appeal from that aspect of the judgment granting summary adjudication to the LLCs on three of Friends' causes of action based in whole or part on the constitutional theory (first, second and sixth), denying summary adjudication to Friends' on its second cause of action on that theory,[8] and granting summary adjudication to the LLCs on Friends' claims based in whole or part on the common law dedication theory (first, third and sixth). Also remaining is Friends' appeal from the judgment in favor of the LLCs on their cross-complaint.

After the case was fully briefed, we received requests from the following proposed amici curiae to file briefs in support of Friends: the California State Lands Commission and California Coastal Commission ("State Amici"), in whose request the County of San Mateo subsequently sought to join, and Surfrider Foundation. In support of the LLCs, we received a request from the Pacific Legal Foundation, California Farm Bureau Federation

---

[7] The LLCs then dismissed their third cause of action for injunctive relief. Thus the court's ruling effectively granted them summary judgment on their cross-complaint.

[8] An order denying a motion for summary adjudication may be reviewed on appeal from a final judgment, at least where there has not been a subsequent trial on the same issue resulting in a decision adverse to the appellant. (*Gackstetter v. Frawley* (2006) 135 Cal.App.4th 1257, 1269–1270; *Waller v. TJD, Inc.* (1993) 12 Cal.App.4th 830, 836; see *Lackner v. LaCroix* (1979) 25 Cal.3d 747, 753; *Whitmire v. City of Eureka* (1972) 29 Cal.App.3d 28, 32, fn.3.) Even if that were not the case, we would have discretion to treat the appeal as a writ. (See *Olson v. Cory* (1983) 35 Cal.3d 390, 400–401.)

7

and California Cattlemen's Association to file an amicus brief.  We granted all of these requests.

## DISCUSSION

Turning to the standards governing motions for summary judgment and summary adjudication under California's summary judgment statute (Code Civ. Proc., § 437c), these standards are by now well established.  (See *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826.)  "Our review of a judgment based upon a grant of summary judgment is de novo.  As in the trial court, the moving party's papers are strictly construed and the opposing party's are liberally construed.  All doubts as to the propriety of granting the motion—i.e., whether there is any issue of triable fact—are to be resolved in favor of the party opposing the motion.  [Citation.]  We independently determine the construction and effect of the facts presented to the trial judge as a matter of law." (*Zack's, Inc. v. City of Sausalito* (2008) 165 Cal.App.4th 1163, 1174.)

Before proceeding to the legal issues, clarity requires that we define certain terms used in this opinion.  When we refer to "tidelands," we mean the lands between the mean high tide line and the mean low tide line.  (*City of Long Beach v. Mansell* (1970) 3 Cal.3d 462, 478, fn. 3.)  "Submerged lands" refers to the lands seaward of the mean low tide line, i.e., under water.  (*Id*.)  "Inland dry sand" refers to the part of the beach that is above the mean high tide line.  Finally, by "beach" we refer to the entire sand area landward of the mean low tide line, including the tidelands (but not including the submerged lands).

## I.

### *Friends' Claims Under California Constitution, Article X, Section 4*

We turn first to Friends' second cause of action seeking to quiet title to a public easement over Martin's Beach Road based on Article X, section 4 of the California Constitution.  We note, preliminarily, that the parties did not contend there was any significant factual dispute regarding the history of title to the Property or the existence of Martin's Beach Road, which runs from the highway to the beach.  The LLCs offered evidence, cited in their statement of undisputed material facts, showing a Mexican Governor provisionally granted the Rancho to Alviso's brother, José María, that the

Rancho included the parcels that comprise the Property, that José María conveyed his interest to Alviso in 1840, that in 1852 Alviso sought a patent for the Rancho from the Board, that the Board and district court confirmed the patent, and that the United States Supreme Court affirmed their decisions. Thus, both parties' arguments about Friends' constitutional theory are purely legal.

Article X, section 4 of the California Constitution provides: "No individual, partnership, or corporation, claiming or possessing the frontage or tidal lands of a harbor, bay, inlet, estuary, or other navigable water in this State shall be permitted to exclude the right of way to such water whenever it is required for any public purpose, nor to destroy or obstruct the free navigation of such water; and the Legislature shall enact such laws as will give the most liberal construction to this provision, so that access to the navigable waters of this State shall be always attainable for the people thereof."

This provision was first adopted by the People as part of the Constitution of 1879, at the end of California's third decade as a state. (Grodin, Shanske & Salerno, The California State Constitution (2d ed. 2016) (Grodin) at pp. 248, 255; former Cal. Const., art. XV, § 2.) Here, as in the trial court, Friends argues this provision bars the LLCs, as the owners of land fronting navigable waters on the California coast, from excluding the public from the road that provides access to those waters. Stated otherwise, Friends argues that Article X, section 4 entitles the public to an easement to use the road across the Property for the purpose of gaining access to the tidelands.

There is, as Friends acknowledges, an unresolved question whether Article X, section 4 confers the broad public right to cross private lands that Friends posits. (Compare *Nollan v. California Coastal Comm'n* (1987) 483 U.S. 825, 847–848 (*Nollan*) (dis. opn. of Brennan, J.) [interpreting Article X, section 4 to give public expectation of access] with *id*. at pp. 832–833 (majority opinion) [citing California cases as suggesting State must obtain easements of access across private property through eminent domain power, while acknowledging no case has "specifically addressed the argument that Art. X, § 4, allowed the public to cross private property to get to navigable water"].) The language of the section is susceptible of such a meaning, but no California court has

9

addressed the issue. Even if the intent was to provide a constitutional basis for a right of access over otherwise private land, language in the provision,[9] coupled with the Legislature's enactment of statutes implementing Article X, section 4,[10] raises the question whether it was intended or understood to be self-executing.

The trial court did not decide whether Article X, section 4 provides the right Friends claims to use a road across or otherwise traverse the Property to access the tidelands. Instead, it held that whatever public rights exist under the California Constitution could not "override the federal land patent title in the [LLCs]." In so holding, the court first relied on *Summa*, *supra*, 466 U.S. 198, which held that the State acquired no public trust interest in lands to which title was confirmed under the 1851 Act patent process based on a Mexican land grant unless such interest was asserted by the State in the patent proceedings. There being no dispute that the LLCs' titles trace back to a provisional Mexican land grant, confirmed under the 1851 Act by the Supreme Court in *Alviso*, *supra*, 64 U.S. 318, without any mention of a public trust easement, the court concluded that no "part of the Property is held subject to the public trust." The court opined that Article X, section 4 is simply "a restatement or codification of the preexisting public trust doctrine as it relates to the tidelands and what rights flow from the tidelands," and that under *Summa*, "the public trust doctrine as it is restated in the California Constitution does not give the Plaintiff public access rights in this circumstance." Finally, citing *Nollan*, *supra*, 483 U.S. at page 831, the court concluded that a ruling to the contrary "requir[ing] [a public] easement across private property for public use would

---

[9] The second clause of Article X, section 4 states "and the Legislature shall enact such laws as will give the most liberal construction to this provision, so that access to the navigable waters of this State shall always be attainable for the people thereof." (Cal. Const., art. X, §4; see also *Sumner Hill Homeowners' Assn., Inc. v. Rio Mesa Holdings, LLC* (2012) 205 Cal.App.4th 999, 1024 ["While it is true that article X, section 4 of the California Constitution protects access to navigable waters, that section also explicitly calls for legislative implementation"].)

[10] Government Code, sections 39933–39938, 66478.4, 66478.11; Public Resources Code, sections 6210.4, 30211, 30212. See Grodin, *supra*, at pages 255–256.

constitute a taking in express violation of the Fifth Amendment to the U.S. Constitution and Article 1, Section 19 of the California Constitution."

The LLCs continue to rely heavily on *Summa*. *Summa* concerned a narrow lagoon connected to a harbor located on the Pacific Ocean in Los Angeles. (*Summa*, *supra*, 466 U.S. at pp. 199–200.) Summa Corporation (Summa) held fee title to the lagoon and property surrounding it, and its title traced back to a Mexican land grant that had been confirmed in proceedings under the 1851 Act. (See *Summa*, at pp. 203–204.) The City of Los Angeles claimed a public trust easement in the lagoon, which it sought to dredge and improve without exercising its eminent domain power. (*Id*. at pp. 199–200.) The California Supreme Court held that the lagoon was subject to the public trust easement claimed by the city and the State, which could thus construct improvements in the lagoon without compensating Summa. (*City of Los Angeles v. Venice Peninsula Properties* (1982) 31 Cal.3d 288, 297, *revd.*, *Summa*, *supra*, 466 U.S. 198.)

Summa contended the lagoon had never been tideland to which a public trust easement attached, that even if it had been tideland Mexican law imposed no servitude on the fee interest by reason of that fact, and that in any event any such servitude was forfeited by the failure of the State to assert it in the federal land patent proceedings. (*Summa, supra,* 466 U.S. at p. 200.) The United States Supreme Court agreed with Summa's third argument. It reversed the California Supreme Court's decision, holding that even if the lagoon was tideland and had been subject by Mexican law to a public trust servitude, the State's claim to the easement was barred by its failure to assert it in the federal patent proceedings. (*Id*. at pp. 200–201.) The court recognized that the State's public trust easement "has been interpreted to apply to all lands which were tidelands at the time California became a State" and that "[t]hrough this easement, the State has an overriding power to enter upon the property and possess it, to make physical changes in the property, and to control how the property is used." (*Id*. at pp. 204–205.) The question, as the court described it, was "whether a property interest so substantially in derogation of the fee interest patented to petitioner's predecessors can survive the

11

patent proceedings conducted pursuant to the statute implementing the Treaty of Guadalupe Hidalgo." (*Id.* at p. 205.)

The *Summa* court had previously held that an "ordinary federal patent purporting to convey tidelands located within a State to a private individual [was] invalid, since the United States holds such tidelands only in trust for the State." (*Summa*, *supra*, 466 U.S. at p. 205.) But, it held, this principle did not apply to lands that had previously been granted by Mexico to other parties where such grants had been confirmed under the 1851 Act. (*Summa*, at p. 205.) "Patents confirmed under the authority of the 1851 Act were issued 'pursuant to the authority reserved to the United States to enable it to discharge its international duty with respect to land which, although tideland, *had not passed to the State*.' " (*Ibid.*, italics added.) This was because the Act was both "intended to implement this country's obligations under the Treaty of Guadalupe Hidalgo" and "also served an overriding purpose of providing repose to land titles that originated with Mexican grants." (*Summa*, at p. 206.) The latter was important because in 1851 "the territory in California was undergoing a period of rapid development and exploitation, primarily as a result of the finding of gold at Sutter's Mill in 1848. [Citation.] It was essential to determine which lands were private property and which lands were in the public domain in order that interested parties could determine what land was available from the Government. The 1851 Act was intended 'to place the titles to land in California upon a stable foundation, and to give the parties who possess them an opportunity of placing them on the records of this country, in a manner and form that will prevent future controversy.' " (*Ibid.*)

Relying on earlier cases involving interests claimed by Native Americans and by the federal government in lands subject to confirmed 1851 Act patents,[11] the *Summa* court rejected California's argument that "since its public trust servitude is a sovereign

---

[11] The court had previously held Native Americans' claims to occupancy rights derived from the Mexican government or Mexican law at the time of the original land grant were barred by their failure "to assert their interest within the timespan established by the 1851 Act." (*Summa*, *supra*, 466 U.S. at pp. 207–209.)

12

right, the interest did not have to be reserved expressly on the federal patent to survive the confirmation proceedings." (*Summa*, *supra*, 466 U.S. at pp. 206–209.) "We hold that California cannot at this late date assert its public trust easement over petitioner's property, when petitioner's predecessors-in-interest had their interest confirmed without any mention of such an easement in the proceedings taken pursuant to the Act of 1851." (*Id*. at p. 209.)

### A. *Summa* Cannot Be Distinguished on the Ground That the Mexican Grant to the LLCs' Predecessor Was Provisional.

Friends attempts to distinguish this case from *Summa* on three grounds. First, it argues that because Alviso's title land grant was merely provisional, his title to the Rancho was confirmed based on equitable doctrines rather than a Mexican land grant. Since the LLCs' title is thus derived from "a prescriptive or adverse right, rather than a land grant," Friends argues, "the Treaty of Guadalupe Hidalgo is inapplicable" and "[b]y extension, the *Summa* case is also inapplicable." Thus, unlike the land in *Summa*, the Property "was transferred to California upon admission to the union in 1850." This argument, while not entirely clear, seems to be that because Alviso did not perfect his title from the Mexican government, somehow the United States came to hold the Property in trust for the State, and when it confirmed the patent it did so on behalf of the State. The Property, therefore, was taken subject not only to the State's public trust easement but also later constitutional enactments.

Friends relies on the following language in *Mott v. Reyes* (1873) 45 Cal. 379 (*Mott*): "It was the practice of the [Mexican] Government to consider a long possession, held under a so-called provisional grant of this character, as entitling the occupant to some sort of priority when the land came finally to be disposed of; a priority resting in no legal obligation, but founded on the apparent justice of awarding to one already in possession, and who had probably made improvements on the land, a prior right to obtain the title in full ownership.'' (*Id*. at pp. 388, 389.) According to Friends, in cases in which the federal government issued patents to parties who had only provisional grants, including *Alviso*, the title and patent were based not on the provisional grant, which

13

carried no title, but on equitable ownership predicated on long and continuous possession, and improvements to and cultivation of the land. "Since title confirmation came via the courts by virtue of a prescriptive or adverse right, rather than a land grant," the Treaty is inapplicable, and "[t]he [P]roperty was transferred to California upon admission to the union in 1850."

We are not convinced. Friends assumes the Treaty protected only land grants that were unprovisional, or in other words for which the Mexican government had already conveyed or obligated itself to convey full title prior to the end of the war. We do not read the Treaty so narrowly, both because its language is susceptible of a broader reading and because Congress and the courts have interpreted it more broadly both in enacting and in applying the 1851 Act. And *Mott*, on which Friends relies, is inapposite.

In relevant part, the Treaty provided that "Mexicans now established in territories previously belonging to Mexico . . . shall be free to continue where they now reside, or to remove at any time to the Mexican republic, retaining the property which they possess in the said territories, or disposing thereof, and removing the proceeds wherever they please, without their being subjected, on this account, to any contribution, tax, or charge whatever." (Treaty, art. 8.) It further provided that "[i]n the said territories, property of every kind, now belonging to Mexicans not established there, shall be inviolably respected. The present owners, the heirs of these, and all Mexicans who may hereafter acquire said property by contract, shall enjoy with respect to it guaranties equally ample as if the same belonged to citizens of the United States." (*Id*.) The language "*property which they possess*" and "*property of every kind*" is broad enough to encompass interests other than fee simple title. We must adopt the broader meaning. (*Nielsen v. Johnson* (1929) 279 U.S. 47, 52] [treaties must be given liberal construction]; *Tashiro v. Jordan* (1927) 201 Cal. 236, 241 [same]; *State v. Tagami* (1925) 195 Cal. 522, 527 [same].)

14

This is especially so because Congress's interpretation of the Treaty, which is entitled to great weight,[12] is similarly broad. Enacted three years after the United States and Mexico settled the war and signed the Treaty, the 1851 Act required those "claiming lands in California by virtue of *any right or title derived from the Spanish or Mexican government*" to present their claims to the commissioners with evidence in support of their claims so the commission could examine the evidence produced by the claimant and by the United States and "decide upon the validity of the said claim." (1851 Act, § 8, italics added.) This language indicates Congress interpreted the Treaty to protect not only "title" but also some broader category of "rights." The 1851 Act also provided that commissioners and courts, "in deciding on the validity of any claim brought before them under the provisions of this act, shall be governed by the treaty of Guadaluope [*sic*] Hidalgo, the law of nations, the laws, *usages, and customs of the government from which the claim is derived, the principles of equity,* and the decisions of the Supreme Court of the United States, so far as they are applicable." (*Id.* § 11, italics added.) Had Congress understood the Treaty to apply only to perfected titles, little law beyond the Treaty and international law would be needed to resolve a claim; there would have been no occasion to invoke Spanish or Mexican "usages," "customs" or "principles of equity."

Both the Board of Land Commissioners and federal courts regularly considered claims based on interests less than perfected titles from the Spanish or Mexican government. The *Alviso* case in this respect is hardly unique. Although not all provisional or inchoate claims were confirmed, the Board and the courts regularly entertained them. (See, e.g., *United States v. Garcia* (1859) 63 U.S. 274; *De Haro v. United States* (1866) 72 U.S. 599; *United States v. Pico* (D.Cal. 1870) 27 F. Cas. 537,

---

[12] See *Medellin v. Texas* (2008) 552 U.S. 491, 513 ("It is . . . well settled that the United States' interpretation of a treaty 'is entitled to great weight' "); *Kolovrat v. Oregon* (1961) 366 U.S. 187, 194 ("While courts interpret treaties for themselves, the meaning given them by the departments of government particularly charged with their negotiation and enforcement is given great weight"); *Pigeon River Co. v. Cox Co.* (1933) 291 U.S. 138, 161 (action of Congress understood as practical construction of treaty).

538 (No. 16,048); *United States v. Chaboya* (N.D.Cal. 1862) 25 F. Cas. 371 (No. 14,769).)

It is, of course, possible that the 1851 Act was intended to settle private land claims beyond those the Treaty required it to honor. But later cases addressing disputes over land for which a party had obtained a patent under the 1851 Act reflect an understanding that the Treaty protected at least some land claims based on equitable and inchoate interests.

In *United States v. Flint* (C.C.D.Cal. 1876) 25 F. Cas. 1107 (No. 15, 121), *affd. sub nom. United States v. Throckmorton* (1878) 98 U.S. 61, the district court rejected a collateral attack by the United States government on patents issued to holders of provisional titles, claiming they were fraudulently obtained. The court held that a final decree under the 1851 Act was conclusive as to the government. As the district court stated, "By the transfer of California from Mexico to the United States, the rights of private property of the inhabitants were not affected. They remained as under the former government. The public property of Mexico and sovereignty over the country alone passed to the United States. This was in accordance with the rule of public law, which is recognized by all civilized nations when territory is ceded by one state to another. The obligation, therefore, to protect private rights of property devolved upon the United States, without any formal declaration to that effect. But, in recognition of this obligation, Mexico obtained from the United States, in the treaty of cession, an express stipulation for such protection. *And the term property, as applied to lands, and as used in the treaty, comprehends every species of title, perfect or imperfect. 'It embraces,' says Chief Justice Marshall, 'those rights which are executory as well as those which are executed.'* The United States, therefore, took California bound by the established principles of public law, and by express stipulation of the treaty, to protect all private rights of property of the inhabitants. The obligation rested for its fulfillment in the good faith of the government, and required legislative action." (*Flint*, at p. 1109, italics added.)

16

In *Beard v. Federy* (1865) 70 U.S. 478, 489 (*Beard*), the United States Supreme Court held that the land claim of a Catholic bishop based not on a writing or grant, but on long possession and canon law in force in Mexico prior to war, was within the jurisdiction of the Board under the 1851 Act. "These averments clearly present a case within the jurisdiction of the Board of Commissioners. They show 'a claim by virtue of a right or title derived from the Spanish or Mexican government,' which is all that is required by the act of 1851. That act does not define the character of the right or title, or prescribe the kind of evidence by which it shall be established. It is sufficient that the right or title is derived from the Spanish or Mexican government, and it may in some instances rest in the general law of the land . . . ." (*Beard*, at p. 489.)

Even before *Beard*, it was accepted that claims based on imperfect title were governed by the 1851 Act, when the question was raised whether those who had perfect titles were required to submit claims to the Board under that Act. In holding that they were, the court stated its understanding that claims based on something other than title perfected before the Treaty was signed *were* protected by the Treaty to whatever degree they would have been protected under the laws of the prior governments (Spanish or Mexican), and that anyone making such a claim was required to seek confirmation through the patent process. (*Fremont v. United States* (1854) 58 U.S. 542, 553 (*Fremont*) [the 1851 Act embraces inchoate and equitable titles as well as legal titles]; see also *Botiller v. Dominguez* (1889) 130 U.S. 238, 248 (*Botiller*) [rejecting argument that 1851 Act applied *only* to imperfect, inchoate, and equitable claims because language of Act "includes every person claiming lands in California 'by virtue of any right or title derived from the Spanish or Mexican government' "].)

These cases bear not only on the United States Supreme Court's interpretation of the 1851 Act, but on its interpretation of the Treaty. In *Fremont*, the court stated: "It is the duty of the court to protect rights obtained under [Mexican laws], which would have been regarded as vested and valid by the Mexican authorities." (*Fremont*, *supra*, 58 U.S. at pp. 561–562; see also *id*. at p. 567 [dis. opn. of Catron, J.].) In *Botiller*, the court described the 1851 Act's purpose as "to separate and distinguish the lands which the

17

United States owned as property . . . from those lands which belonged, *either equitably or legally*, to private parties under a claim of right derived from the Spanish or Mexican governments." (*Botiller*, *supra*, 130 U.S. at p. 249, italics added.)  In discussing how courts would evaluate lands as to which title had and had not been perfected, the court again indicated both types of right were derived from Mexican law and protected by the Treaty:  "The superior force which is attached . . . to a perfect grant from the Mexican government had its just influence in the board of commissioners, or in the courts to which their decisions could be carried by appeal.  If the title was perfect, it would there be decided by a court of competent jurisdiction, holding that the claim thus presented was valid; *if it was not, then it was the right and the duty of that court to determine whether it was such a claim as the United States was bound to respect, even though it was not perfect as to all the forms and proceedings under which it was derived*." (*Ibid*., italics added.)

Nearly four decades later, the court confirmed this interpretation of the Treaty in *Astiazaran v. Santa Rita Land & Mining Co*. (1893) 148 U.S. 80, 81, stating: "Undoubtedly private rights of property within the ceded territory were not affected by the change of sovereignty and jurisdiction, and were entitled to protection, *whether the party had the full and absolute ownership of the land, or merely an equitable interest therein*, which required some further act of the government to vest in him a perfect title." (Italics added.)[13]

_____

[13]  To add icing to this already many-layered cake, the California Supreme Court—in a case not cited by either of the parties—long ago interpreted the Treaty to encompass inchoate property rights.  "[T]he United States, by the treaty of Guadalupe Hidalgo, in effect stipulated for the protection of the rights of property of the inhabitants of the ceded territory.  By the eighth article they provided that Mexicans established in the territory might remain there or remove to the Mexican Republic, and retain their property, or dispose of the same and remove the proceeds.  . . .  [¶]  The term property as applied to lands, embraces all titles, legal or equitable, perfect or imperfect." (*Teschemacher v. Thompson* (1861) 18 Cal. 11, 23 (*Teschemacher*).)

18

These authorities plainly demonstrate that Congress and the courts understood the Treaty to require recognition by the federal government of at least some interests in land as to which the claimant had not perfected title. Whether such a claim would be confirmed depended on the circumstances, but if the evidence showed the Mexican government intended to grant the land to the claimant and the claimant had established an equitable interest through long-time possession and improvements, the Board and courts would, pursuant to the 1851 Act and the Treaty, confirm the claim based on equitable rights that would have prevailed under Mexican law.

Based on the language of the Treaty, as well as the interpretation given to it by Congress and the courts, we reject Friends' argument that the LLCs' title to the Property is not derived from rights conferred by the Mexican government and protected by the Treaty. Rather, the import of the Board's and the courts' confirmation of the Alviso claim, to which the LLCs' title is undisputedly traced, is that the land patented to Alviso, including the portion eventually acquired by the LLCs, was not at the time of the Treaty in the public domain of Mexico and therefore did not become part of the public lands of the United States after the war. (See *Summa*, *supra*, 466 U.S. at p. 205.) Instead it was at the time of the Treaty, and remained thereafter, the private property of Alviso. (See *Garcia v. Howard*, *supra*, 63 U.S. at p. 280.) Since the Property did not become part of the public lands of the United States, contrary to Friends' argument, it was not conveyed by that government to the State in 1850 or at any time prior to confirmation of Alviso's claim and issuance of the patent to Alviso. (See *City of Los Angeles v. Venice Peninsula Properties* (1988) 205 Cal.App.3d 1522, 1532, 1533–1534 [California never acquired title to land, including tidelands and submerged lands, that was subject to prior land grant by Mexican government].) Neither the United States nor California acquired a public interest in the land, including under the public trust doctrine, because neither asserted any such interest during the patent proceedings. (*Id*. at pp. 1533–1534; *Summa*, *supra*, 466 U.S. at pp. 206–209; see *Alviso*, *supra*, 64 U.S. 318.)

Finally, Friends' reliance on *Mott* does not aid their argument that the Treaty protected only perfected title and not equitable interests. Unlike in *Teschemacher*, in

19

*Mott* the California Supreme Court did not address what property rights the Treaty protected. It involved two competing claims to land, each of which had previously been confirmed by the district court in patent proceedings. The court was called on to decide which of two competing claimants had superior title. In doing so, it did not purport to determine what rights, provisional or otherwise, the United States was required to honor under the Treaty. And as is apparent from the opinion, the district court had honored both parties' rights, leaving for future resolution the dispute between them. (*Mott*, *supra*, 45 Cal. at p. 382.)

### B. *Summa* Cannot Be Distinguished on the Ground That Article X, Section 4 Is Distinct from the Public Trust Doctrine.

Friends' first attempt to distinguish *Summa* having been disposed of, we turn to its second argument, which is a fallback position. According to Friends, "[e]ven if there had been a Mexican Land Grant, *Summa* is not controlling" because "Article X, Section 4 is not a codification of the Public Trust Doctrine." The constitutional right here, Friends posits, derives from a constitutional provision added to the California Constitution "some 20 years after title was confirmed in *U.S. v. Alviso*," and it cannot be that the State may never enact any laws that burden or affect real property derived from Mexican land grants. Friends contends that *Forestier v. Johnson* (1912) 164 Cal. 24 (*Forestier*) stands for the proposition that "an owner of a land patent takes the land subject to [Article X, section 4:] 'The words of the Constitution are to be considered as incorporated in the grant or patent the same as if inserted therein. They become a part of it and qualify it so that the estate granted is limited to the permitted uses.' [*Forestier*,] at [p.] 34." Friends also relies on *People ex rel. Webb v. California Fish Co.* (1913) 166 Cal. 576 (*California Fish*).

This argument, too, is misplaced, for two reasons. First, contrary to Friends' position, Article X, section 4 *is*, at least in part, a codification of the public trust doctrine, and *Forestier* makes that clear. It was well established long before *Forestier*, and indeed before the section that later became Article X, section 4 was adopted in 1879, that the State held tidelands "in trust and for the benefit of the people," and that the public had the

right to use such lands for purposes of navigation and fishery. (*Ward v. Mulford* (1867) 32 Cal. 365, 372; see also Grodin, *supra*, at p. 252.) In *Forestier*, the California Supreme Court interpreted the predecessor to Article X, section 4 as protecting the very same public rights to use tidelands and other navigable waters that historically were protected under the public trust doctrine.

In affirming a decision holding the public had the right to use a waterway known as "Fly's Bay" for navigation and related purposes, the *Forestier* court explicitly relied on the public trust doctrine. (*Forestier*, *supra*, 164 Cal. at p. 30.) It considered whether the statute under which the State conveyed the disputed land to the plaintiff was intended to extinguish these public rights and concluded it was not. Instead, the court concluded, the statute permitted the State to convey lands containing tidelands or other navigable waters to private persons, but "sale under these laws authorizes no destruction of any public easement, . . . the public right of navigation therein is not destroyed, the purchaser takes subject thereto, and he has no right to enjoin or prevent any citizen from exercising the public rights incident thereto." (*Id.* at p. 34.) Turning next to article XV, section 2 of the State Constitution (the predecessor to current Article X, section 4), the court explained that the provision was designed to eliminate any doubt regarding the intent and duty of the State to preserve the navigation rights held in trust by the State. (*Forestier*, at p. 34.) The State Constitution thus limited the power of the Legislature to alienate tidelands without preserving public trust interests. (*Ibid.*) In short, the provision that became Article X, section 4, in essence, gave further protection to the rights already recognized under the pre-existing public trust doctrine. (See also *California Fish*, *supra*, 166 Cal. at p. 588 ["Since the adoption of that Constitution in 1879, if not before, grants of such lands by the state carry, at most, only the title to the soil subject to the public right of navigation"].)[14] Indeed, the State Amici acknowledge that "Article X, section 4

---

[14] Like *Forestier*, in *California Fish* the court relied heavily on the public trust doctrine for its analysis. (See *California Fish*, *supra*, 166 Cal. at p. 591 ["It is not to be assumed that the state, which is bound by the public trust to protect and preserve this public easement and use, should have intentionally abdicated the trust as to all land not

21

and much legislation enacted pursuant thereto can be characterized as 'embodiments' of the public trust doctrine."

*Forestier* belies Friends' argument that Article X, section 4 is unrelated to the public trust doctrine. The two are intertwined. Both relate to tidelands and submerged lands and are grounded in "the public rights of commerce, navigation, fishery and recreation." (See *Zack's, Inc. v. City of Sausalito*, *supra*, 165 Cal.App.4th 1163, 1174–1175; Cal. Const., art. X, § 4.) That said, Friends also contends that Article X, section 4 created public rights broader than those historically recognized under the public trust doctrine. This leads us to the second flaw in Friends' attempt to distinguish *Summa*.

Even if Article X, section 4 were entirely distinct from the public trust doctrine, that would not render *Summa* inapplicable to Friends' claims under that section. That is because *Summa* does not depend on the source of the State's claimed interest in lands confirmed under the 1851 Act. As discussed above, the *Summa* court held that any interest the State claimed in lands for which a Mexican land grant was confirmed under the 1851 Act was forfeited by the State's failure to assert it during the federal patent proceedings. This is evident from the *Summa* court's reliance on earlier cases rejecting Native Americans' claimed rights of occupancy derived from Spanish or Mexican law or from reservations allegedly placed on the original Mexican grants. Those claims were not based on the public trust doctrine, and yet the court held they were forfeited by failure to assert them in the patent proceedings. (*Summa*, *supra*, 466 U.S. at pp. 207–208, citing *Barker v. Harvey* (1901) 181 U.S. 481 and *United States v. Title Ins. Co.* (1924) 265 U.S. 472; see also *United States ex rel. Chunie v. Ringrose* (9th Cir. 1986) 788 F.2d 638, 646

---

within the very limited areas of the reservations, and should have directed the sale of any and every other part of the land along the shores and beaches to exclusive private use, to the destruction of the paramount public easement, which it was its duty to protect, and for the protection and regulation of which it received its title to such lands"].)

[the "far-reaching holding" of *Summa* "evidences the Court's conclusion that the land confirmation proceedings were intended to be all-encompassing"].)[15]

### C. *Summa* Cannot Be Distinguished on the Ground That Article X, Section 4 Is Mere Regulation of an "Incident of Ownership."

Finally, Friends asserts a third basis for distinguishing *Summa*: the right involved here—an easement to use Martin's Beach Road to traverse the LLCs' property and thereby access the tidelands—is a mere "incident[] of ownership," which is governed by state law, whereas *Summa* involved a more substantial property interest that was " 'substantially in derogation of the fee interest patented to petitioner's predecessors,' " which for that reason was governed by federal law. (Italics omitted.) In *Summa*, the State claimed the right to enter onto a substantial portion of the patented property (which either had been or later became a lagoon) to make physical changes to it and to control how it was used. (*Summa*, *supra*, 466 U.S. at p. 205.)

The LLCs respond that the issue is not a matter of degree and that the question under *Summa* is whether the right claimed is "substantially in derogation of the fee interest." They further assert that public use of Martin's Beach Road to traverse the Property is in substantial derogation of the fee interest because it infringes on the right to exclude others, which is an essential characteristic of private ownership. We agree with the LLCs.

The LLCs cite *Kaiser Aetna v. United States* (1979) 444 U.S. 164 (*Kaiser Aetna*), which held that an owner's improvements to a shallow inland lagoon that connected it to the ocean thereby converted it into a navigable water body and subjected it to the federal government's regulatory power, but did not entitle the government to grant the public a right to use the pond for recreational purposes. Specifically, the court held that the federal navigational servitude does not create a blanket exception to the Takings Clause

---

[15] Plaintiff cites *Alameda Gateway, Ltd. v. United States* (1999) 45 Fed. Cl. 757, but that case does not address the application of *Summa* to the federal navigational servitude as Friends contends. It mentions *Summa* only in dicta recounting that the State had not asserted any public trust interest in the submerged land at issue there when it was patented under the 1851 Act. (See *Alameda Gateway*, at pp. 759–760 & fn.5.)

of the Fifth Amendment. (*Kaiser Aetna*, at p. 172). The government could, for example, "have refused to allow" the dredging that the owner had done "on the ground that it would have impaired navigation in the bay" or "could have conditioned its approval of the dredging on petitioners' agreement to comply with various measures that it deemed appropriate for the purpose of navigation." (*Id*. at p. 179.) But the court rejected the government's contention, which it characterized as being that "as a result of one of [the owner's] improvements, the pond's connection to the navigable water in a manner approved by the Corps of Engineers, the owner has somehow lost one of the most essential sticks in the bundle of rights that are commonly characterized as property—the right to exclude others." (*Id*. at pp. 176, 179–180.) Doing so would "result in an actual physical invasion of the privately owned marina. [Citations]. And even if the Government physically invades only an easement in property, it must nonetheless pay just compensation." (*Id*. at p. 180.)

The LLCs also rely on *Nollan*, *supra*, 483 U.S. 825, another contribution to the Supreme Court's unconstitutional takings jurisprudence. There, the court held the California Coastal Commission could not require property owners to make an easement across their beachfront available to the public on a permanent basis as a condition of granting a permit allowing them to demolish their house and replace it with a larger one where there was an inadequate nexus between the State's interest in public access and the rebuilding project for which the permit was issued. The court stressed prior cases holding that "as to property reserved by its owner for private use, 'the right to exclude [others is] "one of the most essential sticks in the bundle of rights that are commonly characterized as property." ' " (*Id.* at p. 831.) It went on to opine: "We think a 'permanent physical occupation' has occurred, for purposes of [Takings analysis], where individuals are given a permanent and continuous right to pass to and fro, so that the real

24

property may continuously be traversed, even though no particular individual is permitted to station himself permanently upon the premises." (*Id.* at p. 832.)[16]

Neither *Kaiser Aetna* nor *Nollan* involved titles derived from Mexican land grants and patented under the 1851 Act, and neither addressed whether the government's actions would have been barred by failure to assert them in accordance with *Summa*. Nevertheless, their discussion of the importance of the "right to exclude" as an aspect of property ownership and the tension between public access requirements and fundamental private property rights sheds considerable light on which side of the *Summa* line the Supreme Court would place the claim to a public easement over Martin's Beach Road. We have little doubt the court would hold that imposing a public access easement over the road would be more than incidental and "substantially in derogation of the fee interest" within the meaning of *Summa*. As such, it would hold the State was required to assert an easement at the time of the patent and that its failure to do so has worked a forfeiture.[17]

For all of the foregoing reasons, we conclude that Friends' second cause of action based on Article X, section 4 of the California Constitution is barred under *Summa.*

**D. Even if Friends' Constitutional Claim Were Not Barred by *Summa*, Article X, Section 4 Is Not Retroactive and Thus Does Not Burden Lands Held in Private Ownership Before Its Enactment.**

As Amicus Surfrider Foundation points out, a claim based specifically on Article X, section 4 could not have been asserted in the *Alviso* patent proceedings, which took place in the 1850s, because that section was not added to the State Constitution for

---

[16] Similar is *Dolan v. City of Tigard* (1994) 512 U.S. 374, 384, 393, which held that a city's requirement that a property owner dedicate a portion of her property within a flood plain for a bicycle/pedestrian pathway constituted a taking because there was an inadequate nexus between the required dedication condition and the proposed development's impact. (*Id.* at pp. 388–396.)

[17] We do not address, as it is not raised by this case, whether imposing an access requirement as a condition to development under state statutes such as the Coastal Act of 1976 would effect a taking. That question is entirely distinct from the application of *Summa* and is not before us.

25

another 20-plus years (in 1879). But even assuming the State's failure to assert an interest in land during patent proceedings would not work a forfeiture under *Summa* because the constitutional provision from which the interest derives did not exist at the time the patent proceedings took place, Friends' (and Surfrider's) arguments that Article X, section 4 creates a right of access assumes that provision is retroactive—that it applies to properties held in private ownership at the time it was enacted. We find no basis for such an interpretation.

Friends offers no authority for its "retroactive" interpretation. Certainly *Forestier* and *California Fish* do not support it. Both involved land sales made by the State to private parties *after* adoption of the 1879 Constitution containing what is now Article X, section 4 (then article XV, section 2). (See *Forestier*, *supra*, 164 Cal. at p. 27 [land transferred in 1906]; *California Fish*, *supra*, 166 Cal. at p. 588 ["The record in these several cases shows that the purchasers of the tide lands, under whom the defendants claim, paid the purchase money for their respective lands after the constitution of 1879 took effect"].) In *California Fish*, the court implied the result might have been different had the parties purchased the property before the 1879 Constitution took effect. (See *California Fish*, at p. 588 [purchasers had no vested right in land at time 1879 Constitution took effect and thus land they purchased was impressed with the limitations the Constitution imposed].) Thus, neither *Forestier* nor *California Fish* supports Friends' contention that Article X, section 4 retroactively impressed the restrictions it contains on lands acquired by private parties *before* 1879.

While neither party discusses the 1879 constitutional debates for this purpose,[18] what scant discussion there was of the section during those debates indicates it was not intended to be retroactive.[19] In addition to that legislative history, we apply the well-

---

[18] The LLCs discuss the constitutional debates in arguing that Article X, section 4 does not create the right of access over land that Friends claims, an issue we, like the trial court, do not decide.

[19] See 3 Willis and Stockton, Debates and Proceedings, California Constitutional Convention 1878–1879, pages 1478, 1481 (remarks of Ayres, proponent of section).

26

established principle of construction that, absent clear legislative intent to the contrary, enactments apply prospectively, which the California Supreme Court has held applies to constitutional amendments as well as statutes. (*Strauss v. Horton* (2009) 46 Cal.4th 364, 470–473.) Especially if, as Friends contends, Article X, section 4 creates rights to encroach on private lands that did not exist before 1879, its retroactive application could conflict with constitutional principles that bar deprivations of vested rights without due process. (*See Strauss*, at p. 473.) In any event, there is no indication of legislative intent—much less "clear" legislative intent—that section 4 would operate retroactively, and we decline to hold that it does.

For the foregoing reasons, we affirm the trial court's grant of summary adjudication to the LLCs, and denial of summary adjudication to Friends, on Friends' second cause of action, except as we discuss in Part III, *post*. Further, to the extent Friends' first and sixth causes of action for injunctive and declaratory relief are predicated on its Article X, section 4 theory, we affirm summary adjudication on those causes of action as well.[20]

## II.

### *Friends' Causes of Action Alleging Express Dedication*

Under the common law, an owner of property, through words or conduct, may convey the intent to dedicate an interest in land to the public, and the public may accept the "offer" to dedicate in various ways. Friends pleaded a common law dedication claim as its third cause of action, which it titled: "Third Cause of Action for Quiet Title for a Public Easement to Martin's Beach Road and for Recreational Use of the Inland Dry Sand and Parking Area by Express Dedication." Unlike its state constitutional claims,

---

[20] Friends in effect combined multiple causes of action in the injunctive and declaratory relief causes within the complaint. For purposes of summary adjudication, we may address separate causes of action separately, even if a plaintiff has combined them in one nominal "cause of action" in her complaint. (*Exxon Corp. v. Superior Court* (1997) 51 Cal.App.4th 1672, 1688, fn.11; *Lilienthal & Fowler v. Superior Court* (1993) 12 Cal.App.4th 1848, 1854.)

Friends' dedication claim is based on the conduct of persons who owned the Property from the early 1900s until the LLCs purchased it in 2008 and the public's use of the road and beach during that period. In broad outline, Friends alleged that the prior owners of the Property, the Deeney family, invited the public to use the beach and the road to the beach both by words and conduct, specifically by posting a large billboard on the highway inviting the public to come to the beach by way of the road, by "welcom[ing] all 'with open arms,' " and by constructing public toilets, a parking area and a convenience store catering to those who visited the beach.

In moving for summary adjudication on this claim, the LLCs did not attempt to refute any of Friends' factual allegations. Rather, they conceded the truth of those allegations for purposes of the motion. Their argument was that, as a matter of law, those facts could not suffice to establish an "express dedication," which is the label Friends gave to its claim. The LLCs thus effectively used the motion for summary adjudication to challenge Friends' pleading in the manner of a demurrer or motion for judgment on the pleadings, which is permissible. (See *American Airlines, Inc. v. County of San Mateo* (1996) 12 Cal.4th 1110, 1118.)

" 'When a motion for summary judgment is used to test whether the complaint states a cause of action, the court will apply the rule applicable to demurrers and accept the allegations of the complaint as true. [Citation.]' [Citation.] Because the time for a demurrer had passed by the time the [LLCs'] motion was filed, we treat the motion as a motion for judgment on the pleadings. [Citation.] [¶] 'Accordingly, for purposes of this opinion, we treat the properly pleaded allegations of [the] complaint as true, and also consider those matters subject to judicial notice. [Citations.] "Moreover, the allegations must be liberally construed with a view to attaining substantial justice among the parties." [Citation.] "Our primary task is to determine whether the facts alleged provide the basis for a cause of action against defendants under any theory." [Citation.]' " (*Ibid*.)

Since this is a pleadings challenge, we begin our discussion with the facts Friends alleged in support of their dedication claim. According to the complaint, "[f]or decades, Martin's Beach . . . was a popular community beach where generations of people

28

picknicked [*sic*], stoked barbeques, netted smelt, rode waves, watched sea lions, collected sea shells, and relaxed with family and friends." "The Beach's former owners, the Deeney family, welcomed all 'with open arms,' not to mention a general store, public bathrooms and, to our grandparents, a $.25 entry fee." "Postcards from the '50s show hundreds of people enjoying idyllic days at a beach that at times had the feel of a Mediterranean escape." "In more recent years, surfers, in particular, enjoyed what the website Surfpulse refers to as a 'mystical and multi-faceted playground' and what Save the Waves' program director called 'a natural theme park with sand.' "

According to the complaint, "[h]orizontal access" to Martin's Beach, meaning access "along the coast," is, by reason of the cliffs to the north and south, "impossible unless one wishes to rappel down a cliff or come in by boat." "Vertical access, or westerly travel from the nearest public roadway to the shoreline, is only possible via Martin's Beach Road, which belongs to defendants, [who own] the parcels to the east of the Tidelands." "Defendant's predecessors in interest expressly offered and through their actions offered to the public access to the Tidelands via Martin's Beach Road over a period of decades," and "through their actions offered to the public use of the dry sand inland and the area historically used for parking over a period of decades." A dedication was effected by the predecessors' acts of "offer[ing] use of Martin's Beach Road to the public to access the Tidelands by a writing on a large billboard along a public road for many decades" and "offer[ing] use of the Beach to the public by, amongst other actions, constructing a parking lot, providing toilets, and opening a convenience store at the beach that catered almost exclusively to the public that came to use the Tidelands," and by the public's acceptance through the use of Martin's Beach "for many decades." These allegations comprise Friends' third cause of action but the same theory is incorporated into its first and sixth causes of action for injunctive and declaratory relief.

As already mentioned, the LLCs did not dispute any of these allegations; for purposes of the motion, they conceded them. Apart from a summary of Friends' allegations, the only facts in the section of the LLCs' separate statement devoted to Friends' third cause of action for dedication are the Property's location, the existence of

29

the "private road" from the highway to the beach and Friends' disclaimer of various easement theories. Friends did not dispute any of these facts, which are consistent with allegations in its complaint. This is the record on which the LLCs sought summary adjudication of Friends' dedication cause of action.

We will now summarize the parties' arguments below. In their memorandum of points and authorities in support of their motions, the LLCs argued that for there to be an "express dedication" "very specific requirements" must be met. The grant must be made in certain ways, such as by express grant to a public entity in the form of a recorded grant deed, "a transfer for a specific purpose," a "grant of easement" or "recording a map of a subdivision." Further, it must "reserve specific uses to the grantor," and there must be "an acceptance by a public entity of the offer to dedicate." The LLCs argued that the conduct alleged by Friends, including erecting the billboard and providing a parking lot, toilets and general store, did not satisfy these requirements. There was no grant to "any public or governmental agency" and "[t]he billboard was does [*sic*] not purport to grant any person any rights at all and does not specify the specific uses reserved for the grantor," and "[a]t most," it "advertised permissive use of the Property pursuant to a license." Finally, the LLCs argued that "Plaintiff has no evidence that there was an 'acceptance' of such offer by any ***public entity***." "There is no authority," the LLCs contended, "holding that the use of the beach by the general public constitutes 'acceptance' of an express dedication." For these reasons, "Plaintiff cannot establish the elements required for an 'express dedication' as a matter of law."

In opposition, Friends argued "[t]here are but two elements for express dedication: offer and acceptance." Friends took issue with the LLCs' legal contentions "that the offer and acceptance must be to a public agency" and that the offer or intent element requires a deed or other formal writing. It argued that "the intention to dedicate may be manifested by an offer in writing or orally or *by the owner's conduct*" and that "[a]cceptance may be formal, as by resolution or ordinance, *or by use*." The intention to dedicate was established here, Friends argued, by "the construction of a large billboard to woo all who pass by," as well as the "open[ing] [of] a convenience store to cater to the

30

visitors they wooed." Acceptance was established by the general public's use over a lengthy period. Finally, since the LLCs had admitted the facts on which Friends based its dedication claim, Friends argued "there is no need for us to provide a declaration attesting to these facts," though it claimed to "have done so in an abundance of caution."

The trial court, agreeing that the relevant facts were undisputed, accepted the LLCs' legal arguments regarding the "specific requirements" for express dedication. In rejecting Friends' dedication claim, the court mentioned the lack of a "recorded grant deed." However, it rested its grant of summary adjudication to the LLCs on two other grounds. First, while acknowledging that "the billboard can reasonably be taken as a writing and . . . that Defendants' predecessor-in-interest, the Deeneys, consented to having the public enter the property for permissive recreational use," the court concluded "[t]hese facts . . . do not constitute an 'express dedication,' which . . . *is ordinarily based on a history of use and access that is not on a permissive basis and not given, as this one, pursuant to the payment of a fee*." (Italics added.) Second, the trial court held that "by doing the things alleged by the Plaintiff, including maintaining the billboard on their property, the public toilets, and the convenience store, the Deeneys were engaging in commercial advertising in furtherance of their private ownership rights that go back to the United States land patent discussed above. That commercial advertising did not constitute an express dedication of the road or of any form of public access from the ocean."

The LLCs repeat here most of the arguments they made in the trial court, including that Friends were required to prove "an express grant to a public or governmental agency and . . . an acceptance by a public entity of the offer to dedicate." (Italics omitted.) They take issue with Friends' contentions that "an 'intention to dedicate' can be manifested by an 'offer made in writing or orally or even by the owners' conduct' " and that "paid use of the beach by the general public constitutes the 'acceptance' of an express dedication." They cite Civil Code section 1009 to bolster their contentions that "voluntary use will not constitute a dedication absent an 'express written irrevocable offer of dedication' given in the manner specified by the Code **and** an

31

acceptance by the 'county, city, or other public body to which the offer of dedication was made,' given in the manner specified in the code." The LLCs dismiss the cases Friends cites as inapposite because they "involve[] an 'implied dedication' theory," which the LLCs characterize as "an entirely different theory never pled by [Friends] below." "Having failed to plead an 'implied dedication' theory below," the LLCs argue, Friends "may not rely upon it on appeal." Finally, the LLCs rely on the allegation of a fee to defeat Friends' dedication claim, arguing that "by charging a fee to use the private road on the property, [the LLCs'] predecessor-in-interest allowed use 'only pursuant to a license', thereby negating a finding of intent to dedicate the road to the public" and that "paid use of the beach by the general public" cannot constitute " 'acceptance' of an express dedication." They argue that "[a]t most, the billboard advertised permissive use of the Property pursuant to a license, not an offer to dedicate."

Friends' arguments also resemble those it made in the trial court. Besides its disagreement with the LLCs' legal contentions about the requirements for express dedication and their argument that the facts fail to support the elements of express dedication, Friends argues the trial court added "elements [that are] not a part of a cause of action for express dedication," namely "lack of permission" and "lack of commercial advertising." Regarding the latter, Friends argues that while "[t]here is no doubt that the Deeneys hoped to enjoy a commercial benefit from the public's use of the road (purchase of goods from the store, etc.), . . . that does not mean that the use of the road to access the beach was not expressly dedicated. The Deeneys used a public resource, the beach, to lure people into using Martins [*sic*] Beach Road which, in turn, led to their convenience store." In response to the LLCs' argument that the billboard invited use only pursuant to a license, Friends argues the LLCs have provided "neither authority nor argument" for the proposition and that we should decline to address it.

32

We turn now to the law governing dedication and the parties' arguments about the elements of such a claim. "A common law dedication[21] is a 'grant and a gift' of land or an interest in land to the public for a public use, e.g., for a highway or park." (Witkin, *supra*, § 239, p. 293.) A claim for dedication has two elements: "intention to dedicate[22] by the owner, and acceptance by the public." (*Ibid*.) "In California, 'Dedication of land to a public use is simply setting it apart or devoting it to that use. To constitute a dedication at common law no particular formality of either word or act is required.' " (*Western Aggregates, Inc. v. County of Yuba* (2002) 101 Cal.App.4th 278, 297 (*Western Aggregates*).) "A common law dedication does not require a writing, nor must the formalities of any statute, such as the statute of frauds, be satisfied. All that is necessary is sufficient evidence that the property owner either expressly or impliedly manifested an unequivocal intention to offer the property for a public purpose[23] and that there was an acceptance of the offer by the public. [Citations.] In each instance the question whether there has been a dedication is a question of fact [citations], and that intent may be demonstrated in any conceivable way that a person's intention can be shown." (*Cherokee Valley Farms, Inc. v. Summerville Elementary School Dist.* (1973) 30 Cal.App.3d 579,

---

[21] " 'There are two kinds of dedications of private land to public use: those made under controlling principles of common law, and those made from compliance with statute.' (26 Cal.Jur.3d (2008) Dedication, § 2, p. 182, fn. omitted.)" (*Biagini v. Beckham* (2008) 163 Cal.App.4th 1000, 1014 (*Biagini*).) In this case, we address common law dedication. There are statutes that prescribe methods of dedicating land for public use (see 12 Witkin, Summary of Cal. Law (10th ed. 2005) Real Property, §§ 244–248, pp. 297–303 (Witkin)), but Friends has made no claim based on such a statute.

[22] The cases and Witkin refer to the first element varyingly as an "offer" to dedicate and an "intent to dedicate." (See, e.g., Witkin, *supra*, §§ 239, 241, pp. 293–295.) In addressing this element, the courts focus, almost invariably, on whether by words or conduct the owner manifested an unequivocal intent to dedicate the property to public use. For convenience, we will use "intent to dedicate" in referring to the first element.

[23] Even if the evidence of dedicative purpose is derived from inference, "that purpose must clearly appear from the surrounding circumstances." (*Hays v. Vanek* (1989) 217 Cal.App.3d 271, 281 (*Hays*).)

584–585 (*Cherokee Valley*), citing *Tischauser v. City of Newport Beach* (1964) 225 Cal.App.2d 138, 144.)  Likewise, the acceptance element "may be formal, as by resolution or ordinance, or by use."  (Witkin, *supra*, § 242, p. 295.)

The LLCs place great emphasis on Friends' labeling of their claim as one for "express dedication," and suggest that most of the authorities Friends cites are inapposite because they involved a separate cause of action known as "implied dedication."  The distinction is less important than the LLCs suggest.  Neither Witkin nor most of the common law dedication cases focus on those labels.  The elements of common law dedication are the same for either:  an offer or intent to dedicate and an acceptance.  The only difference is "in the mode of proof" of the intent element.  (*People v. Marin County* (1894) 103 Cal. 223, 227.)  " '[E]xcept for the requirements as to proof, emphasis on the distinction would seem to have no legal significance.' " (*Morse v. E.A. Robey & Co.* (1963) 214 Cal.App.2d 464, 468.)  The difference has been described thusly:  "In [an express dedication] case the intention to appropriate the land to public use is manifested by some outward act of the owner manifesting his purpose, while in [an implied dedication case] it is usually by such acts or conduct not directly manifesting the intention, but from which the law will imply the intent."  (*Marin*, at p. 227; accord *Friends of the Trails v. Blasius* (2000) 78 Cal.App.4th 810, 821 (*Friends of the Trails*); *People v. Sayig* (1951) 101 Cal.App.2d 890, 896; *Lyons v. Schwartz* (1940) 40 Cal.App.2d 60, 65.)  Implied dedication is based on a showing of either "acquiescence of the owner in use of the land under circumstances that negate the idea that the use is under a license" or "open and continuous use by the public for the prescriptive period."[24] (*Gion v. City of Santa Cruz* (1970) 2 Cal.3d 29, 38 (*Gion*), partially abrogated by statute

---

[24] The second type of implied dedication is akin to adverse possession or prescriptive rights and is sometimes referred to as "[d]edication by adverse user" or dedication "implied by law."  (See *Union Transp. Co. v. Sacramento County* (1954) 42 Cal.2d 235, 241(*Union Transp. Co.*), abrogated in part on other grounds by Sts. & Hy. Code, §§ 941, 1806.)

as stated in *Friends of the Trails*, at p. 823; *accord Western Aggregates*, *supra*, 101 Cal.App.4th at p. 298.)

The LLCs' contention that "express dedication" has "very specific requirements," including a formal written deed or similar document granting land to a public agency, an explicit reservation of rights by the owner and an acceptance by a public entity, finds no support in the law. Even for express dedication, no particular words or form of expression are required. All that is required is that "the owner's intent to dedicate is manifested in the overt acts of the owner." (*Friends of the Trails*, *supra*, 78 Cal.App.4th at p. 821; see *California Water & Tel. Co. v. Public Utilities Com.* (1959) 51 Cal.2d 478, 494 ["unequivocal intention need not be expressly stated; it may be inferred from the acts of the owner and his dealings and relations to the property"; "[d]edication is normally evidenced by some act which is reasonably interpreted and relied upon by the public as a 'holding out' or indication of willingness to provide service on equal terms to all who might apply"]; *Union Transp. Co.*, *supra*, 42 Cal.2d at p. 240 ["an offer by the owner of the land, clearly and unequivocally indicated by his words or acts, to dedicate the land to a public use"].) Thus, California courts on numerous occasions have held the intent to dedicate element was established by words or overt conduct of an owner other than a grant deed to a public agency or similar formal writing.[25]

---

[25] E.g., *Smith v. City of San Luis Obispo* (1892) 95 Cal. 463, 466–467, 470 (erection of fences marking out public street); *Wright v. City of Morro Bay* (2006) 144 Cal.App.4th 767, 770 (under common law, act of filing for record a map showing lots separated by defined areas named as streets constitutes offer to dedicate street to public use); *Kitzman v. Newman* (1964) 230 Cal.App.2d 715, 723–724 (construction of sidewalk in front of building); *City of Laguna Beach v. Consolidated Mortg. Co.* (1945) 68 Cal.App.2d 38, 45–46 (*City of Laguna Beach*) (financial contributions made by property owners to install boardwalk along ocean side of their lots); *Davidow v. Griswold* (1913) 23 Cal.App. 188, 192–193 (sale of lots by reference to map upon which are delineated streets and parks).

Nor, contrary to the LLCs' contention, must an express dedication be accepted in a formal way or *by a public entity*. The LLCs cite no case so holding[26] and we are aware of none.[27] Rather, the cases hold precisely the opposite. One example is *Hanshaw v. Long Valley Road Association* (2004) 116 Cal.App.4th 471 (*Hanshaw*), in which landholders of properties fronting on a roadway offered to dedicate the road to the county under the Subdivision Map Act. The county accepted the middle portion of the road but never acted on the portions to the north and south, which became the subject of litigation. (*Id*. at p. 475.) Notwithstanding the county's failure to accept the offer as to the northern and southern parts of the road, the trial court held the public's use of them constituted an acceptance sufficient to establish a common law dedication, and the Court of Appeal agreed. (*Id*. at pp. 475, 477–482.) The attempted statutory dedication coupled with testimony by one of the owners supported the trial court's finding that there was an "explicit offer of dedication." (*Id*. at pp. 481–482.) And "[a]lthough it was accepted in a

---

[26] The LLCs quote language from *City of Anaheim v. Metropolitan Water District of Southern California* (1978) 82 Cal.App.3d 763, 770. There, the court addressed a dedication of land to a city for use as public streets that the city had accepted by resolution. There was no claim of acceptance based on public use. The court had no occasion to, and did not purport to, decide whether some other overt act could demonstrate intent or whether public use could constitute acceptance. The same is true of *Baldwin v. City of Los Angeles* (1999) 70 Cal.App.4th 819, also cited by the LLCs, which involved a conditional express offer of dedication the plaintiff claimed had been accepted by ordinance. The court there recognized that acceptance of such an offer may be implied by public use (*id*. at p. 837), but did not address such a claim because it had not been made (see *id*. at p. 840). Finally, *City of Palos Verdes Estates v. Willett* (1946) 75 Cal.App.2d 394, also cited by the LLCs, addressed whether the trustor of property that was part of a subdivision had consented to a deed dedicating a portion of it for park purposes, whether a subsequent conveyance for that purpose was valid and whether conditions in the deed of conveyance had been breached. This case, like the others cited by the LLCs, does not address what conduct suffices to prove acceptance, and nothing in the opinion suggests an express dedication cannot be accepted by public use.

[27] The California Supreme Court has distinguished between acceptance for purposes of public use and acceptance for purposes of imposing liability on a public entity. For the former, public use suffices, whereas for the latter official action is required. (*Union Transp. Co.*, *supra*, 42 Cal.2d at pp. 240, 244 [requiring formal action by public entity's governing body for acceptance of liability].)

36

different manner than anticipated by the offeror, that does not mean this is a case of *implied* dedication." (*Id*. at p. 481.)[28]

The LLCs' invocation of Civil Code section 1009 to support their contentions about the elements of express dedication does not aid their argument. That section, which partially abrogated the common law of dedication in the wake of the *Gion* decision, expressly excludes coastal properties from its reach. (Civ. Code, § 1009, subd. (e); Witkin, *supra*, §§ 249–250.) At oral argument, the LLCs contended that subdivision (f) of section 1009 somehow makes a difference. That subdivision provides that use by the public of coastal property will not constitute evidence of implied dedication if the owner takes any of certain steps, such as annually posting signs or publishing in a newspaper that the right to pass is by permission and subject to the control of the owner, recording a notice, or entering into a written agreement with a government agency providing for public use of the land. (Civ. Code, § 1009, subd. (f) (1)–(3).) We fail to see how this exception aids the LLCs on summary judgment, where they have proffered no evidence that their predecessors took any of these steps, and where any such evidence could not affect the acts of the owners and the public prior to March 1972, when that legislation was enacted. (See Witkin, *supra,* § 250, citing Stats. 1971, ch. 941, § 3 and *Friends of the Trails*, *supra*, 78 Cal.App.4th at p. 823.)

---

**28** To the same effect are *Biagini*, *supra*, 163 Cal.App.4th at p. 1009 (filing of subdivision map delineating street is offer to dedicate, and public use over reasonable period constitutes acceptance); *Western Aggregates*, *supra*, 101 Cal.App.4th 278 at pp. 296–298 (where Congress made explicit offer of dedication, acceptance could be by public use) and earlier cases discussed in *Hanshaw*, *supra*, 116 Cal.App.4th at pp. 477, 481–482. The following additional express dedication cases also found acceptance based on use or other informal acts: *Yuba City v. Consolidated Mausoleum Syndicate* (1929) 207 Cal. 587, 588–589 (city's grading and constructing sewer line along road and public's use of it); *Phillips v. Laguna Beach Co.* (1922) 190 Cal. 180, 182 (public use); *City of Venice v. Short Line Beach Land Co.* (1919) 180 Cal. 447, 451–452 (continuous use as public way); *Smith v. City of San Luis Obispo* (1892) 95 Cal. 463, 470 (public use); *McKinney v. Ruderman* (1962) 203 Cal.App.2d 109, 115 (use over reasonable period).

Ultimately, the LLCs' argument—that Friends purported to assert a claim for "express dedication" and cannot rely on implied dedication cases to support its claim—boils down to a dispute about labels. The LLCs construe the label "express dedication" to encompass an extremely narrow set of circumstances and thereby to exclude circumstances such as those Friends has alleged. When Friends relies on cases that contradict the LLCs' contention, the LLCs dismiss those cases as "implied dedication" cases, which they claim are irrelevant because Friends has labeled its cause of action "express." Even if the LLCs' cramped and legally unsupported definition of "express dedication" were correct—which, as we have already discussed, it is not—the label Friends applied to its cause of action would not be dispositive. What matters is whether the *facts* Friends has alleged in its complaint, which the LLCs have conceded for purposes of their motion, state some viable claim for relief. So long as the facts alleged entitle Friends to relief on some theory, whether denominated "express dedication" or "implied dedication," the LLCs' challenge to the dedication cause of action must fail. That is because the court's inquiry on a pleadings challenge of the kind made by the LLCs here is not whether the plaintiff has properly named "the legal theory on which he or she can prevail," but rather whether "the essential facts of *some* valid cause of action are alleged." (Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 2015) ¶ 7:41, p. 7(1)-21; see *Quelimane Co. v. Stewart Title Guaranty Co.* (1998) 19 Cal.4th 26, 38 ["If the complaint states a cause of action under any theory, regardless of the title under which the factual basis for relief is stated, that aspect of the complaint is good against a demurrer"]; *Saunders v. Cariss* (1990) 224 Cal.App.3d 905, 908 ["It has long been established that in ruling on a demurrer, the trial court is obligated to look past the form of a pleading to its substance. Erroneous or confusing labels attached by the inept pleader are to be ignored if the complaint pleads facts which would entitle the plaintiff to relief"].)

Applying the common law of dedication, there can be little doubt that the facts Friends alleged are sufficient to establish the elements of common law dedication, if they can be proven at trial. The complaint alleged a number of acts on the part of the owners

38

that could manifest an intent to dedicate to the public, coupled with public use over many decades that could establish acceptance. Of course, the ultimate determination whether there was an intent to dedicate and an acceptance by the public will depend on all of the circumstances, as shown by the evidence the parties offer at trial.[29] But the issue here is the pleadings. We conclude that Friends alleged—and the LLCs conceded for purposes of the motion—facts sufficient to establish a common law dedication cause of action absent some other facts that would conclusively negate either element.

The trial court apparently focused on an additional fact as negating the intent element. Specifically, it relied on the fact that the Deeneys at some point charged a fee as conclusively demonstrating that the public's use of the road and beach was "on a permissive basis." Friends' complaint alleged that "a $.25 entry fee" was charged "to our grandparents."[30] We agree with the LLCs that the charging of a fee is a factor that may

_____

[29] See *Hays*, *supra*, 217 Cal.App.3d at p. 282 (whether owner offered to dedicate "is a question of fact requiring an examination of all the pertinent circumstances"); *Flavio v. McKenzie* (1963) 218 Cal.App.2d 549, 552 (similar); *Robas v. Allison* (1956) 146 Cal.App.2d 716 (whether use constitutes implied acceptance is question of fact); *City of Laguna Beach*, *supra*, 68 Cal.App.2d at p. 44 (whether use constitutes acceptance must be determined in light of facts and surrounding circumstances).

[30] The LLCs also offered, although they did not mention in their statement of undisputed facts or opening memorandum, discovery responses in which Friends admitted "a fee was charged at some time" and "[t]o our understanding, at least one predecessor required a fee to use the road." Even if we were to consider this evidence despite the LLCs' failure to mention it in their separate statement or opening brief below, it adds little, if anything, to the allegation about a fee in the complaint.

The LLCs cite in support of their arguments about a fee the trial court's memorandum decision, which obviously is not evidence; the *LLCs'* verified cross-complaint, which they did not cite in the trial court and which cannot in any event be used as evidence in their favor (*College Hospital Inc. v. Superior Court* (1994) 8 Cal.4th 704, 720, fn.7; Code Civ. Proc. § 437c(d)); and a declaration the LLCs apparently proffered in support of an application for a temporary restraining order and preliminary injunction, which they did not cite in the trial court and does not appear to be part of the record they submitted in support of summary judgment. Even if we considered the latter two items, they fail to shed much light on the purposes, time frame or consistency of any fee. The declarant appears only to have personal knowledge about a fee for the period

39

in some circumstances indicate a permissive use (sometimes referred to as a "license") and is therefore appropriate to consider.[31] However, there are a number of problems with the trial court's reliance on the fee in this case. Not the least of these is that the evidence about a fee is extremely limited. We know only that at some time or times a fee was charged for some purpose. It is not clear whether the owners charged the fee for access to the road, use of the beach or perhaps some other purpose (such as parking). Nor is there any indication whether the practice of charging a fee persisted over the many-decades period during which the public used the road and the beach.[32] If there were substantial periods during which the public was invited to and did use the road or beach without charge, a dedication may have occurred even if the owners' actions before or

---

after 1991, and the dedication claim is based on acts dating back to at least the mid-20th century.

[31] Friends claims to be "baffled by the [trial] court's addition of the element of lack of permission" to the dedication cause of action, arguing that "[b]y definition, one who expressly dedicates something to the public is giving permission to the public to use it." Friends misunderstands the issue of permissive use. It is true that words or acts constituting dedication in a general sense provide "permission" to the public to use the land, but on an ongoing and permanent basis. However, as used in the context of common law dedication, permissive use refers to something more limited, specifically, an owner's permitting use on a limited basis, either to a limited group or for a limited period or purpose or under specified conditions. That type of evidence may tend to show the owner intended to control or qualify other parties' access to the property and thereby rebut a finding of dedicative intent. An owner who occasionally or intermittently invites or allows specific individuals, groups or even the public to use land on request or with permission is not deemed to be dedicating, i.e., making a "grant or gift" of the land to the public. If the owner charges a fee for access and permits only those who pay the fee to use the land, this could indicate the owner does not intend to dedicate the property to public use, but instead intends to permit access on a limited basis only to those who pay for the privilege and to maintain the right to exclude others. (See, e.g., *County of Orange v. Chandler-Sherman Corp.* (1976) 54 Cal.App.3d 561, 566–567 [affirming decision holding there was no dedication where, among other circumstances, prior to his totally restricting public use, owner ran a beach camp and charged admission to public, used guards and posted signs in attempt to exclude others, and public use of the beach was casual and haphazard].

[32] Friends in a discovery response stated the belief that "a fee was not charged for many years."

40

after those periods suggests a different intent. This is because "[a]fter acceptance, the dedicator cannot revoke." (Witkin, *supra*, §239, citing *Archer v. Salinas* (1892) 93 Cal. 43, 51; see *Biagini*, *supra*, 163 Cal.App.4th at p. 1011 [" 'the offer to dedicate, and the acceptance by use, both being shown, the rights of the public have immediately vested' "]; *McGinn v. State Board of Harbor Comm'rs* (1931) 113 Cal.App. 695 ["when an owner of land dedicates to public use a portion of the land for highway purposes and such dedication has been accepted, he may not thereafter revoke the dedication"].) Based on the fact that a fee was charged for "entry" to the beach or the road for some portion of the 50-plus years the Deeneys encouraged the public to use those parts of the Property, it was error for the trial court to conclude as a matter of law that such use was consistently "permissive" or pursuant to a license, negating any intent to dedicate. The many unanswered questions about the fee, coupled with the nature of the intent inquiry as dependent on all relevant facts and circumstances, leave us unable to conclude, based solely on the fact that a fee was charged at some time, as a matter of law there cannot have been an intent to dedicate. (See *Richmond Ramblers Motorcycle Club v. Western Title Guaranty Co.* (1975) 47 Cal.App.3d 747, 755 ["It is, of course, a question of fact for the trial court or jury, to be determined from all of the circumstances of the case, whether one's use of another's property is . . . with the permission or license of the owner"]; *Hays*, *supra*, 217 Cal.App.3d at p. 282 [whether owner offered to dedicate "is a question of fact requiring an examination of all the pertinent circumstances"]; *Cherokee Valley*, *supra*, 30 Cal.App.3d at p. 585 [similar].)

A second flaw in the trial court's reliance on the fee and the permissive use theory is that the existence of a fee was nowhere mentioned in the LLCs' statement of material undisputed facts, and the LLCs first argued that the fee demonstrated a license or permissive use in their reply brief in the trial court. The trial court had discretion to consider an argument raised for the first time on reply, but before doing so was required to ensure Friends was provided an opportunity to respond to it. (*Juge v. County of Sacramento* (1993) 12 Cal.App.4th 59, 70–71.) There is no indication that the trial judge

41

provided such an opportunity to Friends, who might in that event have responded with evidence demonstrating a triable issue of material fact pertaining to the issue. (*Ibid.*)

Finally, the trial court relied on the fact that the Deeneys apparently invited the public to use the road and beach for the purpose of generating business in ruling there was no dedication here. The court described the Deeneys' acts, including maintaining the billboard, as "commercial advertising in furtherance of their private ownership rights." This "fact"—if it is one—presents the same problems as the fee issue, and more. The LLCs did not present any legal argument in the court below supporting the idea that the fact that a property owner has a profit motive for inviting public use of his or her land necessarily negates the intent to dedicate—not even in their reply brief. Nor does it appear that, before—or even after—adopting this rule, the trial court gave Friends any opportunity to respond to it. This was improper. (*Juge*, *supra*, 12 Cal.App.4th at pp. 70–71.)

In any event, we conclude the trial court's ruling was in error. It is true that Friends alleged the Deeney family "welcomed all 'with open arms,' not to mention a general store, public bathrooms and, to our grandparents, a $.25 entry fee." It is reasonable to infer that the Deeneys generated revenue from the store and the fee, though whether it exceeded the costs of maintaining the road, parking area and other facilities is not evident. The trial court apparently inferred that the Deeneys had a commercial purpose for inviting the public to use the road and beach and held this negated the intent to dedicate the road or beach. The trial court provided no authority for this proposition nor have the LLCs provided any on appeal.[33] We do not agree that if the Deeneys' invitation to the public to use the road and beach was motivated in whole or in part by an expectation of commercial benefit, this negates their intent to dedicate the road and beach to public use as a matter of law. While the parties have cited no relevant authorities, our

---

[33] We note that initially the trial court cited an unpublished decision of this court from 1971, but deleted it after our clerk, in response to the trial court's letter, informed the trial court that this court lacks authority either to approve citation of an unpublished decision or to certify such an opinion to be published.

42

own research indicates that operation of a commercial enterprise by an owner who reaps benefits from allowing the public to use its property does not negate, and may even support, a finding of intent to dedicate.

On point is *City of Laguna Beach*, *supra*, 68 Cal.App.2d 38, in which the city sought to quiet title to an easement and right of way for public street purposes over a strip of land covered by a boardwalk running along the ocean front. The defendants owned the lots on which the boardwalk had been built. (*Id*. at pp. 39–40.) There had been a boardwalk along this strip of land, used by the public, for 40 years. (*Id*. at pp. 40, 41.) The property owners had made prorated contributions to replace the boardwalk in 1925. (*Id*. at p. 40.) Since 1933, a few years after the city was incorporated, it had periodically inspected and repaired portions of the boardwalk and placed benches along it. (*Id.* at pp. 40–41.) Many lot owners and tenants had placed business structures along it and used the walk to attract customers, especially during the summer season. (*Id*. at p. 41.) Some owners testified that by contributing to the rebuilding of the boardwalk they had not intended to dedicate it to public use, but instead had contributed because "they believed it would 'increase the convenience,' increase 'business,' and increase 'the rental or income value' of their property." (*Ibid*.) The trial court held the owners' conduct did not establish an intent to dedicate (*id*. at pp. 41–42), but the Court of Appeal disagreed. It reversed, finding "rather convincing evidence" of acts by the owners indicating the intent to dedicate. (*Id*. at p. 45.) It observed that while originally there was no street or public way between the rear of the lots and the ocean, as the use of the beach for recreation increased "a potential source of business for the property owners naturally developed." (*Ibid.*) Beginning in 1902, the owners made a "considerable effort . . . to accommodate and encourage [pedestrian] traffic" and "to extend and increase [the walkway's] public use." (*Ibid*.) They constructed a boardwalk "across and beyond two public streets in such a manner as to attract pedestrian traffic from those streets." (*Ibid*.) The fact that the owners paid for the walk under the circumstances, the court held, was "suggestive of their willingness to dedicate the strip to public use rather than of a desire to retain it as private property. It was made a community affair for lot owners in that area all of whom were

43

similarly situated, and they all participated in the common enterprise for the purpose of increasing the rental or income value of their respective properties by inducing a larger public use of this way." (*Id*. at pp. 45–46.) "It also appears that since the reconstruction of the walk many businesses have been established along its easterly side in this block and at least one on the west side, to take advantage of the public use thus invited." (*Id*. at p. 46.)

Far from finding that the owners' rental income and business motivations for inviting the public negated an intent to dedicate, the court held that these facts supported such intent: "These facts show something more than a mere use, such as occurs when some part of the general public begins to cross a vacant lot without permission of the owner. There was here not only knowledge on the part of the owners but an invitation and actual encouragement to a continued use by the public which is inconsistent with any idea that it was intended to be temporary and merely permissive. The fact that such a way is prepared at great expense for the very purpose of attracting the public and inducing them to travel that way in order to bring business and increased rental value to all of the parcels in a considerable area is very strong evidence of an intent to dedicate it to public use. Few, if any, of the cases cited disclose so clear an intention and willingness to dedicate property to public use as here appears." (*City of Laguna Beach*, *supra*, 68 Cal.App.2d at p. 46.)

Another relevant case is *Morse v. Miller* (1954) 128 Cal.App.2d 237, in which a developer acquired acreage and subdivided it to contain several tracts, a beach and an athletic field. A dance hall, entertainment center and bath house were erected on the beach and operated for profit, and food and other refreshments were sold and bathing suits rented. The beach resort was operated "primarily as a promotional venture to attract prospective purchasers of [the subdivided lots] to the premises." (*Id.* at p. 239.) For the same purpose, the beach and athletic field were open to the public for recreational purposes without charge, including the bath house. (*Id*. at pp. 239–240.) Eventually a dispute arose between a subsequent purchaser and a member of the public, who sued the purchaser alleging, among other things, that his predecessors had dedicated the beach and

44

athletic field properties to the public expressly or impliedly. (*Id*. at pp. 241–242.) On appeal by the purchaser from a trial court decision holding there had been a dedication of the beach and athletic field to the public (*id*. at pp. 242–244), the Court of Appeal affirmed, finding "ample support in the record" for the trial court's conclusions. (*Id*. at p. 247.) It quoted with approval the trial court's findings, which indicated that the predecessor's commercial purpose favored, rather than detracted from, a finding of dedication. Specifically, the owner had sold the lots with the promise that the beach and athletic field would remain available for recreational use to all purchasers. It had done so by encouraging the public to use the beach and athletic field, effectively dedicating them to public use. It invited the public " 'in order that [the owner] itself might be benefited and erected structures on the said beach and athletic field in order to further attract the general public to said property and to induce the use thereof.' " (*Id.* at p. 242.) Like *City of Laguna Beach*, the *Morse* opinion demonstrates that operation of a commercial enterprise and having a profit motive for inviting the public to use property do not contradict, and in some circumstances may in fact support, a finding of intent to dedicate.

For the foregoing reasons, we conclude Friends has alleged facts sufficient to state a common law dedication claim. The LLCs have not shown that as a matter of law they are entitled to judgment on this cause of action. We therefore reverse the trial court's grant of summary adjudication to the LLCs on Friends' third cause of action for express dedication and on Friends' first and sixth causes of action for injunctive and declaratory relief to the extent they are based on express dedication.

## III.

### *The LLCs' Cross-Complaint*

As previously stated, the trial court granted summary judgment to the LLCs on the two causes of action remaining in their cross-complaint, for quiet title and declaratory relief. Each of these claims alleged that Friends and others "claim[ed] some interest in the Property that is adverse to [the LLCs'] legal title" and that Friends specifically asserted "some interest in the Property above the mean high tide line, including but not limited to, a public easement to a private road across the Property and an easement to a

45

parking area." The LLCs alleged that such claims "are without any right" and sought a "judgment quieting [the LLCs'] fee simple title to the Property such that Cross-Defendants, and all others who may assert any right, title, or interest in the Property above mean high tide line have no interest whatsoever in the Property," as well as a declaration "that [the LLCs] are the fee owners of the Property and that Cross-Defendants and all who may claim through them have no easement rights, or any other right, title, or interest in the Property above the mean high tide line."

The trial court described the LLCs' cross-complaint as seeking "to quiet title to their Property, including their interest in the private road across the Property *and the off-shore submerged tidelands*." (Italics added.) It then granted summary adjudication on the quiet title and declaratory relief claims, "find[ing] and declar[ing] that (a) said Defendants [LLCs] are the fee owners of the Property located at 22325 Cabrillo Highway, *including off-shore submerged tidelands*, more particularly described in **Exhibit A** (hereinafter the 'Property') and that (b) Plaintiff and its successors, assigns, tenants, or agents, and all persons unknown, claiming any legal or equitable right, title, estate, lien, or interest in the Property adverse to Defendants' title, or any cloud on Defendants' title have no interest in the Property, including but not limited to, any right of public access or easement to use or access the Property for any purpose whatsoever." (Italics added.)

As both Friends and the State Amici point out, the LLCs never sought to quiet title or obtain a declaration regarding ownership of any tidelands or submerged lands. Their cross-complaint did not seek to quiet title either to the tidelands or to submerged lands. They sought relief only with regard to property "above the mean high tide line." The LLCs admit as much in their brief in opposition to the State Amici: "This action was pled and decided as an action to determine whether the public has any right to use and access the property above the mean high tide line."

We agree that the cross-complaint was "pled" that way, but unfortunately the judgment of the trial court was not so limited. In quieting title in the LLCs and issuing declaratory relief with respect to "the Property, including off-shore submerged tidelands,"

46

and holding that Friends and others lack "any right of public access" in such lands, it plainly erred. Such relief is beyond the scope of the cross-complaint which, as the LLCs have recognized, "serve[s] as the 'outer measure of materiality' in a summary judgment motion." Besides failing to allege any ownership interest in the tidelands or submerged lands in their cross-complaint, the LLCs did not proffer any evidence indicating the patent their predecessor Alviso received from the federal government in fact covered the tidelands or submerged lands.[34] Neither of the experts whose declarations they proffered to establish the Property's chain of title offered an opinion on that issue. This issue was not raised by the LLCs' summary adjudication motion and was not before the trial court, which therefore erred in addressing it.

The tidelands and submerged lands issue alone would not require that we reverse summary judgment in favor of the LLCs on their cross-complaint in its entirety, and could be rectified by a remand for modification of the judgment. However, we reverse the trial court's grant of summary judgment on the LLCs' cross-complaint for a more fundamental reason. For the same reason that the LLCs' motion for summary adjudication of Friends' causes of action based on express dedication fails, so must their motion as to their own causes of action, both of which seek a ruling that there was no express dedication. In moving for summary judgment of their own causes of action, the LLCs again carried the burden to refute the adverse claims they were seeking to extinguish. (See *County of Solano v. Handlery* (2007) 155 Cal.App.4th 566, 573 [county's burden in moving for summary judgment on its quiet title cause of action was

---

[34] If the patent did not cover the tidelands or submerged lands, then *Summa*, which addressed tidelands that clearly were encompassed within the federal patent (see *Summa*, *supra*, 466 U.S. at pp. 202 & fn. 2, 204), does not apply to the tidelands or submerged lands here. The trial court opined that even if the tidelands here were not within the Mexican land grant, "Congress had the power and authority to include tidelands within the scope of the land patent . . . ." True enough. But in purporting to quiet title to the tidelands in the LLCs, the trial court seems to have assumed, without a claim having been made or evidence having been presented, that tidelands and submerged lands at Martin's Beach were included in Alviso's patent. That is a factual question raised neither by the cross-complaint nor the LLCs' motion.

47

to show defendant had no defense with respect to that claim]; *Barisich v. Lewis* (1990) 226 Cal.App.3d 12 [plaintiff entitled to summary judgment on quiet title action where he established his ownership interest and negated defense that title was acquired through conveyance in fraud of creditors]; *People ex rel. State of California v. Drinkhouse* (1970) 4 Cal.App.3d 931, 939–940 [state obtained summary judgment on its quiet title action by proving its interest in property and disproving validity of defendant's claims to it].) For the reasons set forth in Part II above, the LLCs did not carry that burden with respect to express dedication. We therefore reverse the trial court's grant of summary judgment to the LLCs on their cross-complaint. Further, we reverse the court's grant of summary adjudication to the LLCs on Friends' constitutional claims to the extent it purports to quiet title to tidelands and submerged lands. On remand, the trial court shall modify that part of its order to delete any reference to quieting title to tidelands and submerged lands.

## IV.

### *The State Amici's Arguments*

In their brief, the State Amici press three arguments. First, they contend that the State owns the tidelands and submerged lands at Martin's Beach because the Rancho granted to Alviso and confirmed by the 1851 Act patent contained no tidelands or submerged lands,[35] *Summa* therefore does not apply, and as a consequence title to the tidelands and submerged lands vested in the State when it entered the Union. As already discussed, the issue of whether the LLCs' property encompasses the tidelands was not

---

[35] These Amici submitted a request for judicial notice that includes the declaration of a licensed land surveyor and Senior Boundary Determination Officer for the State Lands Commission providing and authenticating the United States Surveyor General's plat of the Rancho confirmed to Alviso in 1860, the Surveyor General's Field Notes regarding that survey, and the Patent for the Rancho. The declaration explains the meaning of terms used in the Field Notes and states the declarant's opinion that the Rancho as confirmed in the patent and plat included no tidelands or submerged lands. Because, for the reasons set forth in the text, we reverse the trial court's grant of quiet title to LLCs, including in the tidelands and submerged lands, we deny the State Amici's request for judicial notice as moot. We deny these amici's motion, filed with their supplemental brief, to take evidence on appeal as well.

48

raised by the pleadings or the motions in this case and should not have been decided by the trial court. Since we reverse the trial court's ruling purporting to quiet title in the LLCs—including as to the tidelands and submerged lands—we will not consider or decide these issues.

The State Amici also argue that *Summa* does not prevent the State from exercising its police or regulatory powers over Martin's Beach. In particular, the State asks this court to "confirm" that "the trial court's judgment regarding ownership of property at Martin's Beach does not affect the Coastal Commission's regulatory authority." The trial court specifically stated in its memorandum decision that its decision did "not disturb, in any way, . . . the authority of the California Coastal Commission to make real estate development permits subject to some public access." Since the trial court disclaimed any ruling on the Coastal Commission's authority and did not address any of the State's other police powers or regulatory authorities, and no party raised those issues below or on appeal, the issue is not before us.

Third, the State Amici argue that we must reverse the trial court's judgment as "void" because the State was an indispensable party to the quiet title cause of action in the LLCs' cross-complaint. Amici argue that the State "claims an interest relating to the subject of the action and is so situated that [its] absence will impede [its] ability to protect that interest or leave the existing parties subject to multiple or inconsistent obligations" within the meaning of Code of Civil Procedure section 389. They quote *Save Our Bay, Inc. v. San Diego Unified Port Dist.* (1996) 42 Cal.App.4th 686, 692 for the "controlling test," which is " '[w]here the plaintiff seeks some type of affirmative relief which, if granted, would injure or affect the interest of a third person not joined.' " The trial court's judgment, State Amici contend, "unquestionably 'injures or affects' California's interests: it purports to extinguish the State's ownership interest in its tide and submerged lands" and "the State, as owner of its sovereign lands, is a rival claimant to the property encompassed by the judgment." "Because the State was not included as a party to the action, did not receive notice of the action, and did not participate in the action, the quiet title judgment in favor of the [LLCs] is void."

49

In response, the LLCs claim the court should not address this issue because Friends did not raise it in the trial court, and because the trial court did not determine the seaward boundary of the Property or hold that the tidelands or submerged lands seaward of Martin's Beach belong to the LLCs. They also argue that the State had actual knowledge of the suit and could have intervened but "chose not to." The State should not now be allowed, the LLCs argue, to "claim it was an 'indispensable party' to the lawsuit as a means to argue error."

We conclude the State is not an indispensable party for two reasons. First, the LLCs are correct that their cross-complaint did not seek a ruling quieting title to the tidelands or submerged lands seaward of Martin's Beach. Had they done so, the State would have had reason to seek to intervene at the outset. The problem here is that the trial court issued such relief notwithstanding that the LLCs did not request it. However, we have reversed that part of the decision, in part because title to the tidelands and submerged lands was not raised by the cross-complaint in this case and should not have been adjudicated by the court. As the cross-complaint currently stands, the only interest the State Amici have asserted as the basis for intervention is not raised by this case.

Second, as the State points out, it was not named or served in the case under Code of Civil Procedure Section 764.070—a fact the LLCs do not contest. For that reason, the State argues, it cannot be bound by the trial court's decision. Section 764.070 indeed provides in relevant part that the judgment in a quiet title action "is not binding or conclusive on" "[t]he state, unless individually joined as a party to the action." Since it is undisputed that the State was neither named as a cross-defendant nor served individually with the cross-complaint, it is not bound by the trial court's decision with respect to the LLCs' quiet title claim. Not being bound, the State is free to relitigate any issues relating to the quiet title causes of action that may arise in this case, and for that reason it is not injured or affected by the court's decision. Also, even though it may not be an indispensable party, nothing prevents the State or the parties, on remand, from considering whether the State should join or be joined as a party so that any interest the

50

State claims in regard to the Property may be resolved along with those of the parties. (See Code Civ. Proc., § 762.090; see also Pub. Res. Code, § 6357.)

**DISPOSITION**

We affirm in part and reverse in part the trial court's grant of summary adjudication to the LLCs on Friends' constitutional claims. We reverse the order on the constitutional claims to the extent it purports to quiet title to tidelands and submerged lands. On remand, the trial court shall modify the order to delete any reference to quieting title to tidelands and submerged lands; otherwise the ruling on the constitutional claims is affirmed. We also reverse the trial court's grant of summary adjudication to the LLCs on Friends' dedication claims in its entirety and on the quiet title and declaratory relief claims in the LLCs' cross-complaint to the extent they are based on dedication. And we also reverse the trial court's grant of summary judgment to the LLCs on the LLCs' cross-complaint for the reasons stated in Part III, *ante*. We therefore reverse the judgment and remand the case for trial of Friends' dedication claims and the LLCs' cross-complaint. Friends shall recover its costs on appeal.

 

 

STEWART, J.

 

We concur.

 

RICHMAN, Acting P.J.

 

MILLER, J.

51

Trial Court:   San Mateo County Superior Court

Trial Judge:   Hon. Gerald J. Buchwald

Counsel:

Redenbacher & Brown, Gary Redenbacher for Plaintiff and Appellant.

Kamala D. Harris, Attorney General, John A. Saurenman, Senior Assistant Attorney General, Christiana Tiedemann, Supervising Deputy Attorney General, Joseph C. Rusconi, Deputy Attorney General; Kimberly Anne Marlow, Office of San Mateo County Counsel for California State Lands Commission and California Coastal Commission as Amici Curiae on behalf of Plaintiff and Appellant.

Surfrider Foundation, Angela T. Howe; Shute, Mihaly & Weinberger, William J. White for Surfrider Foundation as Amicus Curiae on behalf of Plaintiff and Appellant.

Hopkins & Carley, Joan R. Gallo, Jeffrey E. Essner, Allonn E. Levy, Dori L. Yob for Defendants and Respondents.

Pacific Legal Foundation, J. David Breemer and Christopher M. Kieser for Pacific Legal Foundation, California Farm Bureau, and California Cattlemen's Association as Amici Curiae on behalf of Defendants and Respondents.